Robert SEATON, Plaintiff–Respondent,

v.

WESTERN AUTO SUPPLY COMPANY, Defendant–Appellant.

No. WD 31083.

Missouri Court of Appeals, Western District.

Nov. 3, 1980.

Mark S. Foster, Stinson, Mag & Fizzell, Kansas City, for defendant–appellant.

Jim R. Petrie, Kelley Law Offices, Kansas City, for plaintiff–respondent.

Before CLARK, P. J., and DIXON and SOMERVILLE, JJ.

SOMERVILLE, Judge.

Robert Seaton (Seaton) filed suit against Western Auto Supply Company (Western Auto) for damages claimed to have been incurred as the result of a temporary injunction obtained by Western Auto against Royce Akers (Akers) an "associate dealer" of Western Auto. Following a bench trial, judgment was entered in favor of Seaton and against Western Auto in the amount of $1,627.62 and for costs, and Western Auto appealed.

Western Auto advances one point on appeal—that the evidence failed to "establish" a "cause of action" on Seaton's behalf against Western Auto. As this opinion unfolds, it will become apparent that Western Auto's position is somewhat unique in the sense that it possesses legal ramifications that go beyond merely questioning the sufficiency of the evidence to support a legally recognizable cause of action.

Unfortunately, the vague and gossamerlike quality of Seaton's petition offers little, if any, assistance for determining his theory of recovery. Therefore, it is necessary to resort to a close, detailed review of the evidence.

Akers, who was not a party to the action which prompted this appeal, was an "associate dealer" for Western Auto in Greenwood, Missouri. He operated his business in a building initially leased from others. During the course of his business, Akers became indebted to Western Auto in the sum of approximately $30,000.00. This indebtedness was collateralized by a security agreement between Akers and Western Auto. The latter had a perfected security interest in all of the inventory, goods, equipment and fixtures located in the building where Akers operated his business. Akers' lease with the original lessors of the building did not expire until August 14, 1977. A copy of this lease was on file with Western Auto. Seaton, who operated a general heating and air conditioning business in Greenwood, Missouri, purchased the building leased by Akers on or about February 9, 1977. Seaton was aware of the terms of Akers' lease before he purchased the building. Seaton, anxious to move his heating and air conditioning business into the building which he contemplated purchasing, contacted Akers about getting early possession prior to purchasing the building. An "agreement" was reached between the two that Akers would vacate the building by February 28, 1977. It is impossible to tell from the record whether the "agreement" reached between Seaton and Akers was oral or written, and its terms, other than to the limited extent mentioned, are not disclosed.

On Sunday, February 13, 1977, Akers ran a notice in the Kansas City Star that he was quitting business and that numerous items listed therein would be sold at public auction at his place of business on February 18, 1977. The items of property listed in the sale notice were those in which Western Auto had a perfected security interest. Moreover, the security agreement executed by Akers proscribed any sale or alienation of ownership of the collateral except in "the ordinary course of business on terms and prices customary therein."

Western Auto did not learn of the public auction contemplated by Akers until February 16, 1977. On February 17, 1977, Western Auto filed a three count petition against Akers in the Circuit Court of Jackson County, Missouri, for moneys owed, judicial foreclosure, and injunctive relief. Pursuant thereto, the Judge of Division III of the Circuit Court of Jackson County, on February 17, 1977, (1) ordered Akers to show cause on February 25, 1977, why a temporary injunction should not be issued enjoining Akers from selling the items of property listed in the sale notice until it could be determined whether or not Western Auto was entitled to judicial foreclosure as prayed for, and (2) issued a temporary restraining order prohibiting Akers from conducting the public auction scheduled for February 18, 1977, or otherwise selling or disposing of the items of property listed in the sale notice until the further order of the court. An injunction bond filed by Western Auto in the amount of $1,000.00 was also approved by the court. A copy of the show cause and temporary restraining order was timely served upon Akers. After being served with the order, more particularly on February 18, 1977, Akers, on advice of counsel, "padlocked" the building in which he had been operating his business. Akers, after padlocking the building, made no attempt to move or to seek approval to move the items of property situated therein to a different location.

At the request of Akers' attorney, the show cause hearing originally set for February 25, 1977, was continued over until

March 4, 1977. Akers, who appeared as a witness on behalf of Seaton at the trial of the principal action, testified to the effect that at the show cause hearing held on March 4, 1977, he stated that he had to be out of the building on March 1, 1977. Seaton testified during the trial of the principal action that he notified counsel for Western Auto sometime between March 1 and March 5, 1977, that it was his "desire to occupy the building". Following the show cause hearing held on March 4, 1977, more particularly on March 11, 1977, the Judge of Division III of the Circuit Court of Jackson County entered an order adjudging and decreeing (1) that the injunction bond filed by Western Auto be increased from $1,000.00 to $30,000.00, (2) that Western Auto have judgment for judicial foreclosure, (3) that the items of property belonging to Akers in said building be sold at public auction pursuant to due notice and advertisement of said public auction, (4) that the proceeds of said public action up to the sum of $29,-905.00 "be deposited, in custodia legis", subject to the control of the court, awaiting the outcome of the case, and (5) that Akers be enjoined from otherwise disposing of the items of property ordered sold at public auction.

Seaton was neither a party to the action brought by Western Auto against Akers nor did he make any effort to intervene therein after obtaining knowledge on March 1, 1977, of the show cause and temporary restraining order served on Akers. There is no indication in the record that Seaton ever attempted to get Akers to remove the items of property from the building to another location pending the judicial sale or that he contacted either Akers, Western Auto, or the court to see if arrangements could be made to do so. On March 8, 1977, Seaton, in consideration of the sum of $150.00 paid by Akers, notified Akers in writing that he was extending Akers' "lease" on "the building until midnight of March 28, 1977". Seaton by way of explanation, testified as follows: "Because the man had no place to go with his merchandise and he had to leave it there, so I granted him the time to leave it there so

he could arrange to get it sold and get rid of it."

A public auction pursuant to the court order of March 11, 1977, was noticed up, advertised and held on March 29, 1977, and Akers vacated the building on the same date.

The amount of $1,627.62 awarded to Seaton as damages was ostensibly predicated on Seaton's testimony that he incurred an obligation for rent at his previous business location in the amount of $1,000.00 while waiting to move into the building which he purchased, $500.00 in moving expenses, and $56.95 for telephone calls, $51.67 for electric charges and $20.00 for insurance in connection with the delay. The trial judge, after pronouncing judgment, announced from the bench that the judgment was based upon his belief that Seaton had sustained damages as a result of Western Auto "obtaining and maintaining the injunction".

The legal theory purportedly relied upon by Seaton to support the judgment rendered in his favor is as vague and indiscernible on appeal as it was at the trial court level. Seaton avoids coming to grips with the problem in his brief by undertaking to tell this court what was not his legal theory of recovery, e. g. that it was not "wrongful" issuance of an injunction or malicious prosecution. From an affirmative standpoint, Seaton describes his theory of recovery in broad, sweeping generalities, i. e., that Western Auto's "maintenance" of the temporary injunction deprived him of his right to "possess and use his property."

■ As held in *Giloti v. Hamm–Singer Corp.*, 396 S.W.2d 711, 713 (Mo.1965), "[a] cause of action consists of at least two essential elements; the wrongful invasion of a right and the privilege or power which law or equity gives to the injured person to seek and obtain redress." As a general proposition, rights which give rise to causes of action at law emanate from contracts, statutes or common law principles of tort. At the trial, it was incumbent upon Seaton to show a state of facts which, as a matter of law, created a right in him, an obligation

or duty on Western Auto's part, and an invasion, default or breach of such right by Western Auto. *Parker v. Lowery*, 446 S.W.2d 593, 594–95 (Mo.1969).

It is patent from the facts that no contractual relationship existed between Seaton and Western Auto. Perforce, no right possessed by Seaton arising from a contractual relationship between himself and Western Auto was breached or violated by Western Auto. It is also patent from the facts that no statutory right inuring to Seaton associated with the underlying injunction proceeding, or otherwise, was breached or violated by Western Auto. Seaton was not a party to the underlying injunction action, made no attempt to intervene therein, and in his brief on appeal expressly disclaimed any interest in the subject matter of the underlying injunction action. In *Hamilton v. Hecht*, 299 S.W.2d 577, 579 (Mo.App. 1957), the court aptly observed that, "at common law no liability was incurred by a plaintiff who in good faith sought and obtained an injunction . . . [a]ny damages suffered . . . because of the injunction were traceable directly to the court which had issued it, and were *damnum absque injuria* . . . [a]n exception was made only to afford relief for malicious prosecution." In order to abrogate the harsh consequences which sometimes flowed from the improvident issuance of temporary injunctions, the legislature in 1835 enacted what were ultimately designated as Sections 526.070, 526.200 and 526.-210, RSMo 1969. At the time of the underlying injunction action, Section 526.070, *supra*, provided in pertinent part that "[n]o injunction, unless on final hearing or judgment, shall issue in any case . . . until the plaintiff, or some responsible person for him, shall have executed a bond with sufficient surety or sureties to the other party, in such sum as the court or judge shall deem sufficient to secure the amount or other matter to be enjoined, and all damages that may be occasioned by such injunction to the parties enjoined, or to a party interested in the subject matter of the controversy . . . ." In analyzing and construing preceding versions of Sections 526.070,

526.200 and 526.210, *supra*, the court held in *The City of St. Louis v. The St. Louis Gaslight Company*, 82 Mo. 349, 357 (1884), "[t]here is nothing in [the statutes'] language or phraseology to indicate that the legislature intended to extend the jurisdiction of the court or the liability of the plaintiff in respect to damages . . . that there is no provision for the assessment of damages [arising from the issuance of an injunction] except as incident to a bond." See also *Hamilton v. Hecht, supra*. By way of recapitulation, Seaton was not a party to the underlying injunction action and, moreover, disclaimed any interest in its subject matter. A collage of facts, applicable statutes, and case authority rejects Seaton's action as being founded upon a statutory right incident to enforcement of the injunction bond filed in the underlying injunction action.

Assuming, arguendo, that Seaton's relationship, collateral at best, to the underlying injunction action, might theoretically give rise to some hybrid form of action sounding in malicious prosecution (which this court does not subscribe to and expressly refrains from deciding), it is clear that the evidence adduced at trial would fail to support such a mythical theory. Evidence of the absence of probable cause and the presence of malice, two of six requisite elements of malicious prosecution in the traditional sense, *Young v. Jack Boring's, Inc.*, 540 S.W.2d 887, 893 (Mo.App. 1974), is non-existent.

Seaton, in light of a basic, long obtaining principle of law, failed to prove a state of facts giving rise to a common law right founded on any nebulous theory whatsoever of tort liability. As expressed long ago in *Keber v. Mercantile Bank*, 4 Mo.App. 195, 196 (1877), "the common law gives no remedy for an injury done by legal proceedings, except the process of the court is abused through malice and without probable cause . . . for *actus legis nemini facit injuriam* [the act of the law does injury to no one]." As more recently expressed in *McAnarney v. Commonwealth Loan Co.*, 208 S.W.2d 480, 485 (Mo.App. 1948), "[i]t is well settled that

no one can complain of the lawful doing of that which the person doing it or causing it to be done has a legal right to do." This basic principle finds textual expression in 1 C.J.S. *Actions* § 15b(4), p. 1008 (1936): "In the absence of elements of malice and want of probable cause, the costs, expenses, or other damage incident to the prosecution or defense of an action is generally damnum absque injuria, for which there is no redress or action . . . it is the policy of the law that every person, acting in good faith, should have free and unobstructed access to the courts for the purpose of invoking their aid to protect him in the enjoyment of his legal rights and property, and, for this purpose, of both maintaining actions and making defense thereto." If the law were otherwise, where probable cause and lack of malice prevail, the chilling effect on the pursuit of legal remedies due to fear of conjectural collateral claims is incalculable.

Beyond the principle hereinabove relied upon, pragmatic aspects of the facts at hand convincingly demonstrate that Western Auto did not breach any right of Seaton's ostensibly resting upon common law principles of tort. The existence of probable cause on Western Auto's part to pursue the underlying injunction action is beyond question. There is not one iota of evidence, direct or circumstantial, that Western Auto's pursuit of the underlying injunction action was maliciously motivated with respect to either Akers or Seaton. Moreover, there is not one iota of evidence, direct or circumstantial, that Seaton, when he first learned of the temporary restraining order on March 1, 1977, made any overtures to either Akers or Western Auto about making arrangements to store the items of property at some other location pending the judicial sale or that Seaton attempted to invoke any available legal remedies against Akers to obtain possession of the building. It is also significant that neither the restraining order nor the temporary injunction prohibited or forbade storage of the items of property at some other location pending the judicial sale. Of equal, if not greater significance, is the fact that during the period of time apposite to the damages claimed by Seaton, Akers was lawfully in possession of the building by reason of the written extension of his lease granted by Seaton. Seaton's contention that Western Auto's maintenance of the injunction deprived him of his right to "possess and use his property" is factually incongruous and legally untenable in equal measure. Right of possession of the building during the time period complained of by Seaton was vested in Akers rather than Seaton by virtue of the latter's extension of the lease. This court has no inclination to indulge in speculation or conjecture as to what latently motivated Seaton in extending Akers' lease, and, concomitantly, vesting Akers with right of possession of the premises until March 28, 1977. The fact remains that Seaton did so. Seaton's volitional deferment of possession occasioned by extension of Akers' lease cannot be squared with Seaton's position on appeal that Western Auto's "maintenance" of the temporary injunction deprived him of possession during the period of time in question and thereby constituted a breach or violation by Western Auto of some nebulous common law right possessed by Seaton sounding in tort. Seaton's attempt to shift the onus of his own act onto Western Auto and torture doing so into breach or violation of a common law right sounding in tort does violence to logic and fails to fall within the auspices of any extant legal principles.

This court is constrained to hold that the trial court erroneously applied the law in rendering judgment in favor of Seaton as the facts adduced in evidence failed to "establish" a "cause of action" on Seaton's behalf against Western Auto. From time immemorial, judgments posited on erroneous applications of law in the context presented by this appeal have consistently met the fate of reversal and no exception is carved by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo.banc 1976), in court tried cases.

Judgment reversed.

All concur.